THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD LYONS, Defendant-Appellant.

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLAUDE GRIFFITH, Defendant-Appellant.

(Nos. 72-272, 72-319 cons.;

Fifth District—November 27, 1974.

*Rehearing denied March 11, 1975.*

194

Robert E. Farrell and Michael J. Rosborough, both of State Appellate Defender's Office, of Mt. Vernon, for appellant Lyons.

Callis & Filcoff, of Granite City, for appellant Griffith.

· Nicholas G. Byron, State's Attorney, of Edwardsville (Raymond F. Buckley, Jr., Assistant State's Attorney, of counsel), for the People in 72-272.

Nicholas G. Byron, State's Attorney, of Edwardsville (James W. Jerz and Martin P. Moltz, both of Model District State's Attorneys Office, of counsel), for the People in 72-319.

Mr. JUSTICE CREBS delivered the opinion of the court:

The defendants, Claude Griffith and Donald Lyons, were indicted and tried together for the crime of murder in the Circuit Court of Madison County. A jury returned a verdict of attempted murder against Griffith and aggravated battery against Lyons, and they were sentenced to the penitentiary respectively for terms of 15 to 20 years and 8 to 10 years. Separate appeals have been filed by each defendant, and we have consolidated them for purposes of review.

The main thrust of each appeal is that defendants were not proven guilty beyond a reasonable doubt and that the court erred in instructing the jury on any crime other than murder.

The indictment charged that said defendants and a third man, Tolman Conway, committed the offense of murder on January 30, 1971, when, intending "to kill or do great bodily harm to Leroy Johnson," they struck and hit him over the head causing his death. The defendants here involved were tried and convicted chiefly on the eyewitness testimony of Leroy Johnson's grandfather, Ernest Pike. Mr. Pike's daughter, Kay Trebing Lyons, was also present but she did not testify. She had known defendant Lyons for some time prior to the incident, and then subsequent thereto and prior to trial she married him. Neither defendant chose to testify or offer any evidence in his own defense.

Mr. Pike was 75 years of age, with a heart condition, and he was hard of hearing. These facts were bought to the attention of the court prior to his testimony, and it was agreed by all parties that his condition would be taken into consideration insofar as the length of any questioning period would be concerned. Mr. Pike testified that at the time in question his daughter, Kay, and her children were living with him and his wife, and that his grandson, Johnson, had been staying with him for about a week. The children were not present as they were visiting a neighbor's home for the night. He was awakened about 3 A.M. when Kay entered his bedroom. He got up and walked into the kitchen to find three men sitting there whom he identified as Lyons, Griffith and Conway. Shortly thereafter Johnson walked in, and though there may have been some conversa-

tion, Mr. Pike could not hear it. He did see that Lyons was holding a derringer pistol on Johnson and that Griffith had a 12-gauge shot gun, and a derringer in his pocket, and that Conway had a .22- or .32-caliber pistol. Almost immediately Griffith began hitting Johnson over the head with the stock of the shot gun. After seven or eight blows the stock broke from the barrel and Johnson fell to the floor with his head split open and one eyeball pushed out. Lyons then stomped him on the chest and kicked him first on one side and then the other. Finally Johnson jumped up and dived for the basement with Lyons and Griffith right behind him. About five minutes later Mr. Pike heard a gunshot from the basement. He stated that he personally was unable to do anything because he was scared and that Conway at all times had stayed upstairs with his gun in his hand. Kay had stayed in the bathroom until defendant Lyons hollered to her to throw Johnson's clothes down, which she did.

Eventually, Mr. Pike went back to his bedroom, and just before daybreak he saw one car leave, and then shortly after daybreak he saw Lyons and Griffith leave, one in Johnson's car and the other in another car. He stated further that there was blood all over the kitchen floor and on the sink and ice box; that he later watched as his daughter, Kay, cleaned it up with water and a cloth, and that he also saw her make two or three trips to the basement with buckets of water which she brought back up and dumped in the sink. Not until about noon did he go to the basement, at which time he noticed a hole broken in the plaster board on the landing going to the basement, that the basement sink was torn apart, and that there were blood spots on the steps and the basement floor.

Several other witnesses testified to what they saw prior and subsequent to the incident. Two girls stated that they and another man had met Johnson at a tavern about 1 A.M. and in two cars had driven to the Pike residence about 3 A.M. One of the girls testified that while they were still seated in the car a man approached the driver's side, argued with Johnson, and threatened both of them with a gun. She then jumped in the other car and left. Another witness testified that on the night of January 29, Kay and the two defendants were in his tavern together and that Kay had left at about 8 P.M., and the defendants left about 1 hour later. Mrs. Pike testified that after having worked all night, she returned home about 8 A.M. She noticed the broken plaster board and mentioned seeing the stains on the basement floor and steps. Johnson's family and a number of witnesses testified that they had not seen Johnson in the 1½ years that had elapsed since January 29, that his personal possessions were still at his parents' house, as was his car, which had been found

by·the police abandoned in East St. Louis a few days after the incident. Also, the testimony of various police officers and technicians was offered concerning items of physical evidence.

In the trial court, and here, defendants seem to be of the opinion that having been charged with murder, and the State having failed to produce a body or other satisfactory evidence of death, they were therefore immune from conviction of any other offense. They declined even to cross-examine the only eyewitness to testify; they offered no evidence whatsoever in rebuttal or explanation; and they objected to the trial court giving the jury instructions and forms of verdict on attempt to commit murder, aggravated battery and battery. Lyons contends specifically that aggravated battery is not a lesser included offense to murder, and Griffith contends, not that attempt murder is not an included offense, but that the giving of the battery instructions constituted error because it caused him to be surprised and misled in making his defense.

■■ These arguments are contrary to both case and statutory law. It is a general rule that when an indictment for a higher crime embraces all of the elements of an offense of an inferior degree, the jury may discharge the accused of the higher crime and convict him of the lower, if the evidence justifies it. (*People v. Dugas*, 310 Ill. 291). By statute, a person who kills an individual without lawful justification commits murder if, in performing the acts which cause death, he either intends to kill or do great bodily harm to that individual. (Ill. Rev. Stat., ch. 38, par. 9—1(a)(1).) A person commits aggravated battery when, in committing battery, he intentionally or knowingly causes great bodily harm. (Ill. Rev. Stat., ch. 38, par. 12—4(a).) An included offense means one which is established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged. (Ill. Rev. Stat., ch. 38, par. 2—9(a).) Applying these rules and definitions, it has been specifically held that aggravated battery is a lesser included offense to the charge of murder because the elements of each offense are substantially the same with the exception that in one the victim is injured seriously and in the other he dies as a result of his injuries. (*People v. Welch*, 131 Ill.App.2d 98.) In *People v. Dugas*, 310 Ill. 291, cases are cited with approval holding that if an indictment for murder contains averments sufficient to charge the offense an accused may be convicted of shooting at another, assault with intent to murder, wilfully and maliciously shooting and wounding, an aggravated assault, or assault and battery.

■■ Justice could hardly be served if the rules were as contended by defendants, and no more vivid example of injustice could be cited than to apply their contentions to the facts of this case. To be able to viciously

beat a man and then be exonerated forever from any accountability because of the State's inability to produce satisfactory evidence of a resulting death would be a travesty. A trial is not a game to be played for a prize based on the dexterity and nimbleness of the players. It is a serious attempt to seek justice both for the accused and society. Defendant Griffith would have us believe that he was surprised and misled by the State's request for, and the court's giving of instructions on, lesser included offenses. This we cannot accept, for certainly he knew or should have known that aggravated battery and battery are lesser included offenses contained in a charge of murder by beating. Illustrative of the inadequacy of this contention is the case of *People v. Helms*, 133 Ill.App. 2d 727. There the trial court directed a verdict for defendant on a one-count murder indictment, but nonetheless the trial proceeded on the lesser included offense of involuntary manslaughter upon which a guilty verdict was returned. Defendant claimed surprise in that the preparation of his defense to a charge of reckless misconduct might have been different than to a charge of wilful misconduct. The court refused to accept this argument, holding that defendant was not prejudiced by such procedure, that he had been furnished with a copy of the indictment well in advance of the trial, and that he was therefore aware of the lesser included offense contained therein.

On this issue, we conclude that aggravated battery is a lesser included offense to the charge of murder in this case and that the trial court acted properly and without prejudice to defendants in instructing the jury and furnishing them with forms of verdicts on aggravated battery and battery.

■■ Next, we consider the contention that defendants were not proven guilty beyond a reasonable doubt. First we mention the often-repeated rule that the credibility of the witnesses and the weight to be given their testimony are matters for the jury to determine; and that a guilty verdict will not be set aside on review unless it is palpably contrary to the weight of the evidence or so unsatisfactory as to cause a reasonable doubt of guilt. (*People v. Tribbett*, 41 Ill.2d 267; *People v. Peto*, 38 Ill.2d 45.) Also, though the phrase causing great bodily harm may not be susceptible of precise legal definition, yet as stated in *People v. Cavanaugh*, 18 Ill.App.2d 279, it describes an injury of a graver and more serious character than an ordinary battery, and whether a particular injury is within the meaning of the statute is generally a question of fact for the jury and not one of law. As described by statute attempt murder is committed when a person, with intent to commit murder, does any act which constitutes a substantial step toward the commission of that offense. (Ill. Rev. Stat., ch. 38, pars. 8—4, 9—1.) And,

intent may be proved from acts and circumstances surrounding the acts of the defendant. (*People v. Olson,* 3 Ill.App.3d 240.) Strikingly similar to the case before us are the facts in *People v. Coolidge,* 26 Ill.2d 533, where defendant disputed his conviction of assault with intent to murder, claiming that he only intended to rob and that his acts did not constitute attempt murder as he only hit his victim with a bottle three or four times. The court held otherwise and, in affirming his conviction, stated that since intent is a state of mind, and, if not admitted, can be shown only by surrounding circumstances, an intent to take life may be inferred from the character of the assault, use of a deadly weapon, and other circumstances. Continuing, the court stated that it is not necessary that the accused should have brooded over intent or have entertained it for any considerable time, but it is enough if at the instant of the assault he intended to kill the party assaulted, or if he was actuated in making the assault by such a wanton and reckless disregard of human life as to denote malice, and the assault was made under such circumstances that, if death had ensued, the killing would have been murder. The court concluded that since the blows of the bottle were directed to an extremely vital and vulnerable part of the human body they necessarily demonstrated such a wanton and reckless disregard for human life as to raise a clear inference of intent to take life.

In the facts before us, the testimony of the only eyewitness to testify has not been challenged. He gave a vivid picture of a vicious and cruel attack by both defendants, one smashing the stock end of a shotgun on the victim's head until the gun itself broke and the other stomping and kicking the victim as he lay on the floor. No medical testimony is necessary to prove the great bodily harm that would necessarily result from such an attack. Nor can there be any question that Griffith's gun swinging attack was actuated by such a wholly wanton and reckless disregard of human life as to clearly imply an intent to take the life of his victim.
■■■ Defendants question the credibility of Mr. Pike, chiefly because of his age and the fact that he was hard of hearing. Also, they contend that the court committed error in allowing leading and suggestive questions to be asked of him. We have reviewed the record and find no merit in either of these contentions. As stated above, the credibility of a witness is for the jury to determine, and we are aware of no reason to fault the jury's acceptance of his testimony. It was not challenged in any way by either defendant, in cross-examination or otherwise. In effect, it stands uncontradicted. Also, except as needed to make himself heard, the prosecutor asked very few questions which might be termed leading, and in most instances objections thereto were sustained. In any event, the propriety of allowing leading questions is within the sound discretion

of the trial court, and is not a ground for reversal unless it appears that this discretion has been palpably abused and has resulted in substantial injury to the defendant. (*People v. Brooks*, 52 Ill.App.2d 473; *McCann v. People*, 226 Ill. 562.) We find no such abuse of discretion here, and we conclude that both defendants were proven guilty of the crimes for which they were convicted beyond any reasonable doubt.

■■  Next, defendants contend that they were prejudiced by the State's efforts to call Kay Trebing Lyons as a hostile witness. The State informed the court that following the incident Mrs. Lyons made statements implicating defendants and confirming Mr. Pike's testimony, but that since her marriage to the defendant she had changed her story. The court was asked to call her as a hostile witness because the State did not feel that it could vouch for her veracity. When this request was refused, the State in the course of the trial revealed her marriage to Lyons, and asked a number of witnesses if they knew of her present whereabouts, and at the close of the prosecution's case her name was called as a witness but she failed to respond. No objection was made to the testimony relating to her marriage other than one based on the technicality that the marriage certificate and not the testimony of the judge who performed the ceremony would have been the best evidence. Obviously, Mrs. Lyons, according to Mr. Pike's testimony, was another eyewitness, and it was not just a prejudicial "tactical maneuver" on the part of the State to try to explain her absence. To the contrary, defendants' attempt to preclude the State from showing the reason for her absence was in reality the "tactical maneuver," for it is apparent that such effort was made with full awareness of the rule than an accused has a right to comment on the unexplained absence of a witness and to argue that the testimony of such witness would have proved unfavorable to the prosecution. (*People v. Scott*, 38 Ill.2d 302.) We find no error on this issue.

Defendants also argue that the court erred in admitting certain physical evidence, particularly a bloody clothespin, a blood-stained newspaper and a spent slug, all found in the basement. They contend that all of these items were irrelevant because they were not charged with killing Johnson by shooting him, that the slug had no blood on it, and the blood on the newspaper and clothespin could not be typed so as to prove it to be the same type as the victim's. These exhibits, and others not specifically mentioned here, were all offered in an attempt to prove the charge of murder, and, as such, their admission had some relevancy. However, their degree of relevancy is now moot, for the jury recognized their insufficiency and the insufficiency of all the evidence to prove the charge of murder. Instead, they brought in verdicts on lesser offenses for which proof was overwhelming. Under such circumstances we find

that the defendants were not prejudiced, nor were the minds of the jury inflamed by the admission of such exhibits.

■■■ Finally, defendants contend that the closing argument of the State was improper and so inflammatory as to deny them a fair and impartial trial. We have reviewed the arguments, and we agree that to some extent the remarks of the prosceutor were unwarranted, but in no sense were they inflammatory. Reference to the victim's family, for instance, would have been better left unsaid. However, it is an accepted rule that where a conviction is based on eyewitness testimony and positive identification, one can only conclude that the conviction was the result of strong evidence of guilt and that it did not result from any passion or prejudice that may have been engendered by improper argument regarding a victim's family. (*People v. Hyde*, 1 Ill.App.3d 831.) In addition, it has been held that a prerequisite to a reversal for alleged improper argument is a finding that the remarks may have influenced the result, or that the verdict would have been otherwise had the remarks not been made. (*People v. Naujokas*, 25 Ill.2d 32; *People v. Stephens*, 6 Ill.2d 257.) Following these rules, we find that the evidence of defendants' guilt of the crimes for which they were convicted was so clear and convincing as to leave no room for any argument that the jury was improperly influenced by any remark of the prosecutor or that the verdict would have been otherwise had the remarks not been made.

As to sentences imposed, defendant Lyons calls attention to the fact that his sentence of 8 to 10 years violates the Unified Code of Corrections, and he requests that his minimum sentence be reduced to conform to its provisions. Aggravated battery is a Class 3 felony, and for such a felony the Code provides that the minimum term imposed shall not be in excess of one-third of the maximum. (Ill. Rev. Stat., ch. 38, par. 1005—8—1(c)(4)). In conformity therewith, we reduce the sentence of defendant Lyons from 8 to 10 years to a minimum of 3 years and 4 months and a maximum of 10 years.

The judgment of the Circuit Court of Madison County finding Claude Griffith guilty of attempted murder is affirmed, and the case is remanded for imposition of sentence under the Unified Code of Corrections (Ill. Rev. Stat., ch. 38, par. 1005—7—1); the judgment of said court as to Donald Lyons is affirmed as modified by a reduction of his sentence.

G. MORAN, P. J., and EBERSPACHER, J., concur.